IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2001

## STATE OF TENNESSEE v. CHRISTOPHER M. FLAKE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-09256    Bernie Weinman, Judge**

---

**No. W2000-01131-CCA-MR3-CD  - Filed July 13, 2001**

---

The defendant was indicted for attempted first degree murder.  A Shelby County jury convicted the defendant of the lesser-included offense of attempted voluntary manslaughter, and the trial court sentenced him to four years imprisonment.  In this appeal, the defendant alleges: (1) his insanity defense was established by clear and convincing evidence; (2) the trial court erroneously admitted statements made by the defendant and a weapon seized from his vehicle; (3) the trial court erroneously restricted the testimony of a psychiatrist by disallowing his statement that the defendant was committable if found not guilty by reason of insanity, while allowing him to testify that the defendant stated he believed he would be free to go home within 60 to 90 days if adjudicated not guilty by reason of insanity; (4) the trial court erroneously allowed the state to call a psychiatrist because the defense was not notified pre-trial that he would be an expert witness; (5) the trial court improperly found that a psychiatrist was qualified to testify as an expert; and (6) the trial court erroneously refused the defendant's request to have the opening and rebuttal closing arguments. After a through review of the record, we reverse the judgment of conviction, modify the judgment to "Not Guilty by Reason of Insanity," and remand for further proceedings pursuant to Tenn. Code Ann. § 33-7-303.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Modified to "Not Guilty By Reason of Insanity;" Remanded**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Leslie I. Ballin, Memphis, Tennessee, and Steven E. Farese, Ashland, Mississippi, for the appellant, Christopher M. Flake.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; William L. Gibbons, District Attorney General; Thomas D. Henderson and John W. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

The background of this case is quite bizarre, although the facts surrounding the shooting are undisputed. The victim was a pastoral counselor at a local church, and he met the defendant approximately six weeks prior to the shooting. The victim scheduled counseling sessions with the defendant three times, each of which the defendant canceled. On April 6, 1997, the victim and Patricia Ann Hoffman were meeting in his office when the defendant, whom the victim recognized, "stuck his head in" the office and inquired if he could meet with the victim. When the victim responded that he would meet with the defendant in fifteen minutes, the defendant shook his head in disapproval and exited the office. Several minutes later the defendant burst into the victim's office, wielding a pistol, and yelled the victim's name. The startled victim inquired if the defendant was kidding. The defendant responded that he was not kidding and shot the victim. Hoffman screamed, and the defendant held a gun to Hoffman's head before fleeing.

On cross-examination, the victim testified that there was no ill will between the defendant and him. He described the incident as being "[s]omething totally off the wall, weird, and crazy." He further described the defendant as changing from a normal appearance when the defendant first walked into his office, into being "horrible looking," "crazed," and "the devil himself."

Officer Robert Brandon Lampley was dispatched to the defendant's residence. Officer Lampley testified that he saw a vehicle pull in the defendant's driveway. The defendant then exited this vehicle and was taken into custody. The defendant's father exited the house and instructed the defendant to cooperate with the officers.

Detective Johnny T. Brown met with the defendant at the residence and advised him of his Miranda rights. The defendant responded that he understood them. After informing Detective Brown that the weapon used in the shooting was located in the vehicle's glove box, the defendant executed a consent to search form. Detective Brown opened the glove box and seized the pistol.

At trial, the defendant relied upon the insanity defense and offered the testimony of Dr. Lynne Zager, Dr. Hilary Linder, Dr. Rokeya Farooque, Dr. Sam Craddock, Dr. John Hutson and Rebecca Smith. The state offered rebuttal testimony of Dr. John McIntosh, Dr. Mark Luttrell, and John Perry. All of these witnesses testified about their mental evaluations performed on, or observations of, the defendant after the commission of the offense.[1]

Dr. Lynne Zager, a clinical psychologist and Director of the Forensic Services Program at Midtown Mental Health Center, testified that she evaluated the defendant from October 17, 1997, to January 28, 1998, under a court order for the purpose of determining the defendant's competency for trial and mental state at the time of the shooting. Dr. Zager determined that the defendant

---

[1] The defendant was found incompetent to stand trial on several occasions. After receiving treatment, including anti-psychotic medication, the defendant was finally determined to be competent to stand trial in February 1999. Defendant's trial began November 15, 1999.

suffered from paranoid schizophrenia on April 6, 1997, and due his severe mental illness, he could not appreciate the wrongfulness of his conduct. She stated the defendant's mental state was evidenced in Dr. Janet Johnson's medical records, upon which Dr. Zager relied.[2] Dr. Johnson's records indicated that she saw the defendant on April 3, 1997, three days prior to the shooting, at the request of the defendant's father "because of his [the defendant's] bizarre behavior." The records indicated the manifestation of the defendant's bizarre behavior occurred when he, after seeing a man on a farm, placed his Prozac medication in the man's mailbox because he "felt that the man was in need of help."

Dr. Hilary Linder, a psychiatrist employed by the state at Western Mental Health Institute, testified that he evaluated the defendant pursuant to a court order in November 1998. He determined the defendant was a paranoid schizophrenic; was severely mentally ill at the time of the shooting; and could not appreciate the wrongfulness of his actions.

Dr. Rokeya Farooque, a psychiatrist employed by the state at Middle Tennessee Mental Health Institute, testified she evaluated the defendant from November 17, 1997, to December 16, 1997. Dr. Farooque stated that the defendant's medical records indicated he experienced hallucinations, blackouts, major depression, an anxiety disorder, and an obsessive-compulsive disorder starting at the age of 12 or 13, and he received psychiatric treatment and hospitalization as a result of his conditions. Dr. Farooque testified that the defendant was a paranoid schizophrenic, and he could not appreciate the wrongfulness of his conduct.

Dr. Sam Craddock, a clinical psychologist employed by the state at Middle Tennessee Mental Health Institute, testified that he examined the defendant in November and December of 1997, pursuant to a court order. He tested the defendant and found that the defendant was not malingering, although he conceded certain test results might suggest malingering. Dr. Craddock opined that the defendant suffered from a serious mental condition at the time of the shooting, and he could not appreciate the wrongfulness of his actions "with a condition." He stated that the defendant believed he "morally felt justified to do it."

Dr. John Hutson, a clinical psychologist, testified that he was hired by the defendant's family and initially met with the defendant on April 8, 1997, two days after the shooting, in the Shelby County Jail. Initially, the defendant refused to talk with him because he was instructed by his attorney to be silent. Accordingly, Dr. Hutson requested defense counsel instruct the defendant that it was permissible to talk with him, and defense counsel complied. Dr. Hutson testified that the MMPI-II test indicated the defendant was psychotic. Dr. Hutson further testified that he had done competency/insanity evaluations on over 10,000 patients since 1974, and he concluded in only approximately 25 cases that the patient could not appreciate the wrongfulness of his or her conduct. He stated that the defendant suffered from "a very serious incapacitating psychiatric illness" from which the defendant could not appreciate the wrongfulness of his actions. Dr. Hutson further stated that " Mr. Flake is one of [the] three most disturbed individuals I've ever seen in my career." Dr.

---

[2]Dr. Johnson was deceased at the time of trial.

Hutson diagnosed the defendant as suffering from schizophrenia, undifferentiated-disorganized type. Dr. Hutson insisted that he did not believe the defendant was malingering, although he conceded some mental health experts might use a different numbering system on the MMPI-II test which might suggest otherwise.

Rebecca Smith, a psychiatric social worker employed by the state at Western Mental Health Institute, examined the defendant and stated that the defendant believed the victim was a terrorist. She further testified that the defendant claimed that voices told him to shoot the victim, but not kill him, and it would be a signal for the FBI.

The state's rebuttal proof consisted of testimony from Dr. John McIntosh, Dr. Mark Luttrell, and John Perry.

Dr. John McIntosh, a psychiatrist employed by the Shelby County Jail to render psychiatric care to inmates, testified that he conferred with the defendant for approximately one hour on May 9, 1997, at the Shelby County Jail. Dr. McIntosh testified he found no evidence that the defendant suffered from psychosis. Dr. McIntosh believed the defendant had a depressive disorder and did not suffer from schizophrenia. On cross-examination, Dr. McIntosh conceded that the other mental health professionals had an opportunity to observe the defendant for a thirty-day period and were in a better position to perform a comprehensive evaluation. Dr. McIntosh acknowledged that he did not have the defendant's prior medical records, and the defendant seemed to be doing well on the psychotropic medicine he had been taking. Dr. McIntosh prescribed both anti-depressant and anti-psychotic medications. Dr. McIntosh further conceded that he agreed with the other evaluations that the defendant had a "serious mental disease," but disagreed that it was schizophrenia. He further acknowledged that he did not examine the defendant for the purpose of determining competency or insanity. Dr. McIntosh was never asked if he believed the defendant could appreciate the wrongfulness of his conduct in view of his severe mental disease.

Dr. Mark Luttrell, a physician who provided medical services at the Shelby County Jail, testified that he was the defendant's primary care physician. Additionally, he stated that he had completed a residency in psychiatry but was not board certified in psychiatry. He stated that he treated the defendant in July 1997, for a urinary tract infection and noticed no apparent mental distress. Dr. Luttrell further stated that the defendant "was unremarkable, . . . just like everybody else." Dr. Luttrell further stated that he observed no signs of schizophrenia. He testified that he did not conduct a mental evaluation of the defendant, but agreed with Dr. McIntosh's diagnosis that the defendant suffered from a severe mental disorder.

John Perry, the director of mental health for the Shelby County Jail, testified that he saw the defendant four or five days per week. He further stated that the defendant did not "sit and stare" in jail, as he stated the defendant was doing in court. Additionally, Perry testified that he joked with the defendant one week prior to court concerning the defendant's weight gain experienced while in jail. On cross-examination, Perry acknowledged that he put the defendant in "protective custody" since he had experienced problems with other inmates.

The jury was instructed on the offense of attempted first degree murder and the lesser offenses of attempted second degree murder, attempted voluntary manslaughter and aggravated assault. The jury returned a guilty verdict on attempted voluntary manslaughter.

## I. INSANITY DEFENSE

The defendant contends that he met his burden of proof in establishing the defense of insanity by clear and convincing evidence. Upon our review of the record, we must agree with the defendant.

### A. Standard of Review

Effective July 1, 1995, the defense of insanity became an affirmative defense. The statute provides:

> It is an *affirmative defense* to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. *The defendant has the burden of proving the defense of insanity by clear and convincing evidence.*

Tenn. Code Ann. § 39-11-501(a) (emphasis added). This statute places the burden on the defendant to establish insanity by clear and convincing evidence; the state is not required to prove sanity. *See* State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

In determining the issue of insanity, the trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994). Where there is a conflict between expert testimony and testimony as to the facts, the trier of fact is not required to accept expert testimony over other testimony and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976). In determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words at or near the time of the offense. Sparks, 891 S.W.2d at 616; Humphreys v. State, 531 S.W.2d 127, 132 (Tenn. Crim. App. 1975).

### B. Analysis

It is undisputed that the defendant had a prior history of mental illness with hospitalizations. He was comprehensively evaluated on numerous occasions, pursuant to court orders, after his arrest on these charges. All such evaluations were performed by mental health experts with extensive experience in conducting mental health evaluations for the criminal justice system. Some were employed by the State of Tennessee; others were not. All agreed the defendant was incompetent to

stand trial for many months. In fact, the defendant remained incompetent to stand trial for almost two years after the shooting. After many months of treatment and medication, he was finally declared competent to stand trial in February 1999. Both evaluating psychiatrists and all evaluating clinical psychologists testified that the defendant, at the time of the offense, suffered from a severe mental disease and was unable to appreciate the wrongfulness of his act.[3] The medical testimony consistently supported the statutory elements of the insanity defense. *See* Tenn. Code Ann. § 39-11-501. Even the two non-evaluating physicians called by the state in rebuttal agreed that the defendant suffered from a severe mental disease.

The testimony of state witnesses Dr. John McIntosh, Dr. Mark Luttrell, and John Perry did not create an issue for the jury. Dr. McIntosh did not perform an evaluation to determine the basis for an insanity defense; he examined the defendant for only one hour; he acknowledged that the other professionals who performed comprehensive evaluations were in a better position to render an analysis; he did not have the defendant's prior medical records; he agreed that the defendant had a "severe mental disease;" and he did not testify as to appreciation of the wrongfulness of conduct based upon this severe mental disease. Dr. Luttrell treated the defendant for a physical illness in July 1997; he did not conduct a mental evaluation; yet, he agreed that the defendant had a severe mental disorder. John Perry offered no insight into the defendant's mental condition at or near the time of the shooting.

A defendant is required to establish the defense of insanity by "clear and convincing evidence." Tenn. Code Ann. § 39-11-501(a). "Clear and convincing evidence" is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Holder, 15 S.W.3d at 911 (citations omitted). Although this is a higher standard than "preponderance of the evidence," it is a lesser standard than "beyond a reasonable doubt." O'Daniel v. Messier, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

After a through review of the evidence, we reach the following inescapable conclusion: a rational trier of fact could only find that there is no serious or substantial doubt that the defendant, at the time of the shooting, was unable to appreciate the wrongfulness of his act as a result of a severe mental disease. Thus, the defense of insanity was established by clear and convincing evidence. *See.* Tenn. Code Ann. § 39-11-501(a).

Although this court affirmed the rejection of the insanity defense in Holder, 15 S.W.3d at 914, a case in which expert testimony supported the insanity defense, we view Holder as distinguishable. We emphasize that each case is fact specific. In Holder, the trial judge, as the trier of fact, specifically recited numerous instances of the defendants's conduct at or near the time of commission of the offense, including the defendant's admission that he knew the killing was "wrong." *Id.* at 909-10. We believe the facts of the instant case are distinguishable. In short, our review of the record does not reveal sufficient lay testimony, nor expert testimony, concerning the

---

[3]We do not view Dr. Craddock's testimony that the defendant believed the shooting was morally justified to be inconsistent with the testimony of the other four evaluating mental health experts.

defendant's mental state at or near the time of the shooting that would justify rejection of the insanity defense.

In reaching this conclusion we are mindful that issues of credibility, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are for the trier of fact, not this court. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nevertheless, if we determine, after viewing the evidence in a light most favorable to the state, that a rational trier of fact could only find that insanity has been established by clear and convincing evidence, then a guilty verdict may not be sustained. *See generally* Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We so find in this case.

Accordingly, the judgment must be modified to "Not Guilty By Reason of Insanity" and the case remanded for further proceedings pursuant to Tenn. Code Ann. § 33-7-303.


## II. SUPPRESSION

The defendant contends the trial court erred by denying his motion to suppress. Although this issue is procedurally moot due to our reversal of the conviction, we will briefly address this issue in the event of review by the Supreme Court of Tennessee.

At the suppression hearing, only Officer Robert Brandon Lampley, Detective Johnny T. Brown, and Dr. John Hutson testified. Officer Lampley and Detective Brown testified as to their encounter with the defendant at his residence at the time of his apprehension. In essence, both indicated that defendant seemed to understand what was transpiring, knowingly indicated his involvement in the shooting, told them where the weapon was, and knowingly signed the consent to search his car which led to the seizure of the weapon. Dr. Hutson testified that the defendant suffered from schizophrenia, was one of the three most mentally disturbed people he had seen, and could not understandingly waive his Miranda rights nor understanding consent to a search. The trial court found that the Miranda waiver and consent to search were knowingly executed and denied the motion to suppress.

This issue presents a close question; however, we find it unnecessary to determine whether the evidence preponderates against the findings of the trial court. If the trial court did err in failing to grant the motion to suppress, we conclude the admission into evidence of the defendant's statement and the weapon was clearly harmless. It was undisputed that the defendant shot the victim. The admission of the defendant's statement and weapon did not affect the judgment. *See* Tenn. R. App. P. 36(b).


## III. TESTIMONY OF DR. HILARY LINDER

The defendant contends that the trial court erroneously allowed the state to elicit Dr. Linder's testimony that the defendant said he would be released within 60 to 90 days if found not guilty by reason of insanity, while refusing to allow Dr. Linder's testimony that the defendant was "committable" and would not likely be released within such period. We find the trial court acted properly.

## A. Denial of Testimony Concerning Commitment

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. For the defendant to be successful in an insanity defense, he must prove by clear and convincing evidence that "*at the time of the commission of the acts constituting the offense*, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts." Tenn. Code Ann. § 39-11-501(a)(emphasis added). The issue of whether the defendant was "committable" at the conclusion of his trial is irrelevant to his defense of insanity, nor is such evidence necessary to correct any incorrect impression left with the jury.

## B. Defendant's Belief Concerning His Release Date

The defendant alleges that the trial court improperly allowed Dr. Linder's testimony concerning the defendant's perceived belief that he would be released within 60 to 90 days if he were found not guilty by reason of insanity. The defendant objected to this testimony with a general objection that appeared to be based on hearsay. During a jury-out hearing, the trial court overruled the defendant's objection and allowed this testimony holding that it showed the defendant's state of mind.

On appeal, the defendant alleges this testimony was unfairly prejudicial and did not give the jury an accurate view of the potential outcome. The defendant has changed theories on appeal. Since an appellant cannot change theories from the trial court to the appellate court, this issue is waived. State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). Regardless of waiver, it is clear to this court that the testimony was properly admitted because it showed a motive for the defendant to exaggerate his mental condition. The trial court properly instructed the jury that "this has nothing to do with what the law is and you're to make no assumptions from what he's said." This issue is without merit.

## IV. NOTIFICATION OF EXPERT WITNESS

The defendant contends that the trial court erroneously allowed the rebuttal testimony of Dr. John McIntosh since he was not timely notified that Dr. McIntosh would testify. We disagree.

Tenn. Code Ann. § 40-17-106 provides that:

It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the same is found, the names of such witnesses as the district attorney general intends shall be summoned in the cause, and sign such indictment or presentment name thereto.

The defendant concedes this statute is directory in nature, and the state's failure to provide notice of a witness does not necessarily disqualify that witness from testifying. *See* State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994). It is clear from the record that the state did not have knowledge of this witness' identity until Dr. Zager's testimony, when the state was first allowed the opportunity to review certain records. Additionally, the defendant was given ample opportunity to cross-examine Dr. McIntosh. The trial court properly admitted this rebuttal testimony.

## V. **EXPERT STATUS OF DR. JOHN McINTOSH**

The defendant next contends that the trial court erroneously allowed Dr. McIntosh to testify as an expert. We disagree.

### A. Standard of Review

Tenn. R. Evid. 702 provides "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The determination of the qualifications of an expert witness and the relevancy and competency of expert testimony are matters entrusted to the sound discretion of the trial court. State v. Pulliam, 950 S.W.2d 360, 364 (Tenn. Crim. App. 1996) (citations omitted). This court will not overturn the trial court's decision absent a clear abuse of discretion. *Id.*

### B. Analysis

Dr. McIntosh testified that he had been board certified in adult psychiatry since 1981; he worked in approximately ten prison systems; he had served as head of a psychiatric ward; and he had served as a forensic evaluator. The defendant objected to expert status because Dr. McIntosh had never been "officially declared" by any court as an expert. We find no authority, nor does the defendant cite any, that requires a witness to have previously testified as an expert in order to be granted expert status by the trial court. The trial court did not err in allowing Dr. McIntosh to testify as an expert.

## VI. CLOSING ARGUMENTS

The defendant alleges the trial court erroneously denied his request to give the opening and rebuttal closing argument at the conclusion of the proof. We disagree.

Tenn. R. Crim. P. 29.1(d) provides in pertinent part that:

. . . while the [s]tate, having the burden of proof, shall have the right to open and close the argument, this right shall not be exercised in such way as to deprive the defendant of the opportunity to fully answer all [s]tate argument. The trial judge upon motion shall enforce this purpose by appropriate rulings.

The defendant argues that because he is required to prove the affirmative defense of insanity by clear and convincing evidence, he is entitled to the opening and rebuttal closing argument. Firstly, the state still had the burden of proof of establishing guilt beyond a reasonable doubt. The insanity defense did not erase that burden. Secondly, the order of final argument is not inherently prejudicial to the defendant. *See* State v. Smith, 857 S.W.2d 1, 24 (Tenn. 1993) (holding the order of final argument allowing state to begin and close final argument in a capital sentencing hearing is not prejudicial to defendant). The trial court did not err in allowing the state to open and close final argument.

## CONCLUSION

Based upon our review of the record, we reverse the judgment of the trial court, modify the judgment to "Not Guilty by Reason of Insanity," and remand for further proceedings pursuant to Tenn. Code Ann. § 33-7-303.

_____
JOE G. RILEY, JUDGE