IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Nashville December 1, 2015


**STATE OF TENNESSEE v. DEWAYNE PICKINS**


**Appeal from the Circuit Court for Madison County**
**No. 14-412     Donald H. Allen, Judge**

_____


**No. W2015-00368-CCA-R3-CD  -  Filed December 29, 2015**

_____


Dewayne Pickins ("the Defendant") was indicted with one count each of aggravated assault, attempted aggravated assault, and violating an order of protection. Prior to trial, the State voluntarily dismissed the charge of violating an order of protection. At the close of the State's case-in-chief, the trial court granted the Defendant's motion for judgment of acquittal as to the aggravated assault charge. The jury convicted the Defendant of attempted aggravated assault. On appeal, the Defendant argues that (1) the evidence was insufficient to support his conviction for attempted aggravated assault and (2) the trial court erred in refusing to allow the Defendant to cross-examine the victim about her prior convictions. Discerning no error, we affirm the judgment of conviction of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant District Public Defender, for the appellant, Dewayne Pickins.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

The victim, Kinena Brown, testified that she had previously been romantically involved with the Defendant. Their romantic relationship ended, but Ms. Brown and the Defendant remained friends. The Defendant did not live with Ms. Brown, but he would watch Ms. Brown's children while she was at work. On the day of the offense, the Defendant was watching Ms. Brown's children, who were asleep in Ms. Brown's apartment. While the Defendant was in the apartment, Ms. Brown went to the liquor store to buy vodka and cigarettes. Ms. Brown estimated that she was gone for approximately forty-five minutes. When Ms. Brown returned to her apartment, the Defendant met her at her car and appeared to be upset that Ms. Brown had been gone for so long. The Defendant smelled the inside of Ms. Brown's car and accused her of having sex with another man. Ms. Brown exited her car and went inside her apartment to the bathroom. The Defendant followed her to the bathroom and asked Ms. Brown for a cigarette. Ms. Brown responded that she did not have any cigarettes. Ms. Brown testified that she was "messing around" with the Defendant at this point because she had just gone to the store to purchase cigarettes.

Ms. Brown then went into her bedroom. The Defendant followed her into the bedroom and hit her in the face with his fist. Ms. Brown fell back onto the bed and unsuccessfully tried to kick the Defendant. The Defendant then grabbed Ms. Brown's foot and "slung" her to the floor where he continued to punch her. Ms. Brown tried to curl herself into the fetal position in order to cover herself, but the Defendant "starting kicking [her] and stomping [her] and hitting [her.]" The Defendant struck Ms. Brown multiple times in her head and in her ribs. Ms. Brown screamed in order to wake up her oldest son so that he could call the police. Ms. Brown's son came into Ms. Brown's bedroom and ran to the nightstand to call the police. At that point, the Defendant stopped attacking Ms. Brown and ran out of the apartment. Ms. Brown estimated that the attack lasted ten minutes.

Ms. Brown spoke with police, and they took photos of her injuries. Ms. Brown reported that she had "knots all across [her] face" from blunt force trauma to her head and that her ribs were broken. Ms. Brown claimed that it was the worst pain she had ever felt in her life. She was prescribed pain medication. Ms. Brown stated that she missed one week of work due to her injuries and that she had difficulty sleeping. Ms. Brown also stated that she had trouble driving.

On cross-examination, Ms. Brown admitted that she had drunk three beers and a shot of vodka on the day of the offense. Ms. Brown denied that the Defendant told her that he was leaving to go see another woman. She also denied threatening the Defendant

with a knife prior to the attack. Ms. Brown confirmed there was no blood on her bed or floor and that the Defendant did not hit her in the nose. Ms. Brown admitted that she drove ten to twelve hours to North Carolina to visit her family approximately one week after the offense. She claimed she had to use pillows for support and had to take frequent breaks from driving.

On redirect examination, Ms. Brown said she was not able to strike or kick the Defendant during the attack, and she denied trying to retrieve any type of weapon. Because the Defendant was on top of her, the only thing she could do was remain in the fetal position to protect herself.

Ms. Brown's eleven-year old son, D.B.,[1] testified that, on the day of the offense, he woke up when he heard his mother yell his name, and he ran into her room. When he entered the room, D.B. saw the Defendant on top of Ms. Brown. Ms. Brown was lying on the ground in "a child's pose folded up," and the Defendant was hitting her with his fists. D.B. saw the Defendant hit Ms. Brown seven or eight times. D.B. took the phone from Ms. Brown's nightstand and called the police. At that point, the Defendant left. D.B. recalled that Ms. Brown's face was swollen. He denied seeing Ms. Brown hit the Defendant at any time. On cross-examination, D.B. denied seeing a knife in his mother's bedroom. D.B. also recalled that Ms. Brown drove D.B. and his younger brother to North Carolina in the week after the attack and that she used a pillow to support her side.

Investigator Steve Gregory testified that he took the Defendant's statement. In that statement, the Defendant said he had been visiting Ms. Brown, and they had been drinking. At some point in the evening, Ms. Brown left the apartment. When she returned, she started arguing with the Defendant, pulled a knife on him, hit the Defendant, kicked him in the private parts, and cut him on his left side. In an attempt to get away from Ms. Brown, the Defendant "hit her upside her head with [his] fist." The Defendant also admitted that he kicked Ms. Brown and that he grabbed her waist to try to get the knife.

At the close of the State's case-in-chief, the trial court granted the Defendant's motion for judgment of acquittal as to the charge of aggravated assault, finding that the evidence was not sufficient to show the victim suffered a serious bodily injury.

The Defendant testified that he and Ms. Brown ended their romantic relationship approximately five months before the "incident." However, after they stopped dating, the Defendant still saw Ms. Brown four or five days a week and continued to have a sexual relationship with her. On the day of the offense, the Defendant accompanied Ms. Brown

---

[1] Pursuant to the policy of this court, minors are identified by their initials.

and her children to a friend's house. While there, the Defendant and Ms. Brown drank beer and vodka. The Defendant returned to Ms. Brown's apartment with her. At some point, Ms. Brown left and was gone for approximately three hours. The Defendant stated that he did not know where Ms. Brown went. The Defendant denied going outside to smell Ms. Brown's car when she returned.

When Ms. Brown came into the bedroom, the Defendant asked her where she had been. Ms. Brown told him that she had gone to get liquor and cigarettes. When the Defendant asked her why it took so long, Ms. Brown told the Defendant "to mind [his] f***ing business." The Defendant followed Ms. Brown to the bathroom and asked her for a cigarette, but she told him that she did not have any. The Defendant then went into Ms. Brown's bedroom, where Ms. Brown was lying on the bed, and his phone rang. According to the Defendant, Ms. Brown said, "[T]hat must be one of your other Bs," snatched the phone from his hand, and then hit the Defendant in his head with her fist.[2] The Defendant became defensive, and Ms. Brown kicked him in his private parts. The Defendant threatened to call the police, and Ms. Brown left the room. When she returned, she had a kitchen knife, started "poking" it at the Defendant, and cut the left side of his torso. The Defendant admitted that he grabbed Ms. Brown's wrists, hit Ms. Brown twice in the head with his fists, and kicked her in the "stomach area." The Defendant claimed that D.B. came into the room after he had "wrestled [Ms. Brown] down to the floor to retrieve the knife from her." The Defendant took the knife from Ms. Brown, threw it onto the couch, and left the apartment.

On cross-examination, the Defendant claimed that Ms. Brown was intoxicated and "out of control" during the incident. The Defendant admitted that he did not "get into the full details of it" when he gave a statement to Investigator Gregory but that he did not leave out the details on purpose; he stated that he "just didn't explain everything that happened" because he did not want to say much without a lawyer present and, at the time, he "didn't know that it was going to come to [a jury trial] this point here." The Defendant also claimed that Ms. Brown "sliced" him with the knife on his torso where his clothes would cover the wound. The Defendant confirmed that he was wearing a "wife beater" during the incident, but he claimed that his clothes were not cut when he was "sliced" because the wound was not deep. After being further questioned about how he was "sliced" but his clothes were intact, the Defendant stated that the injury was caused by "a little ole' poke," and there was a small spot of blood on his clothes that someone could see "[i]f you looked at it hard enough."

---

[2] At some point before this interaction, the Defendant told Ms. Brown that he was planning on leaving her apartment to visit another woman.

The jury convicted the Defendant of attempted aggravated assault. Following a sentencing hearing, the trial court sentenced the Defendant to eight years' incarceration. This timely appeal followed.

## II. Analysis

*Sufficiency of the Evidence*

The Defendant argues that the evidence was insufficient to support his conviction for attempted aggravated assault because Ms. Brown did not suffer serious bodily injury and "any notion that the [Defendant] would have continued the offense until he did cause serious bodily injury is purely speculative." The State argues that the evidence was sufficient to support the conviction because the Defendant intended to cause serious bodily injury and took a substantial step toward completing that act. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As pertinent to this case, "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [r]esults in serious bodily injury to another." Tenn. Code Ann. § 39-13-102(a)(1)(A)(i) (Supp. 2013). "A person commits assault who: (1) [i]ntentionally, knowingly, or recklessly causes bodily jury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or

knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offense or provocative." Tenn. Code Ann. § 39-13-101(a)(1)-(3) (Supp. 2013). "Serious bodily injury" is

> bodily injury that involves: (A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) [a] broken bone of a child who is eight (8) years of age or less.

Tenn. Code Ann. § 39-11-106(34) (Supp. 2013).

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (2010).

In this case, the Defendant admitted that he assaulted Ms. Brown by kicking her and hitting her with his fists. Additionally, the trial court found that there was no evidence that Ms. Brown suffered serious bodily injury. However, because the jury had ample evidence that the Defendant attempted to commit aggravated assault against Ms. Brown, their verdict was not based on speculation. Testimony at trial established that the Defendant attacked Ms. Brown and forced her onto the ground, where she was defenseless. While she was on the ground, he continued to hit and kick her and only stopped the attack once D.B. came into Ms. Brown's bedroom and called the police. As a result of the attack, Ms. Brown suffered swelling to her face and head and she also suffered broken ribs. From these facts, the jury could have concluded that the Defendant intended to inflict serious bodily injury on Ms. Brown and that he took a substantial step toward completing that act. Therefore, we conclude that the evidence was sufficient to

support the Defendant's conviction for attempted aggravated assault.  See State v. Albert Lamont Bennett, Jr., No. M2012-01003-CCA-R3-CD, 2013 WL 4680408, at *5 (Tenn. Crim. App. Aug. 28, 2013), perm. app. denied (Tenn. Jan. 16, 2014) (concluding there was sufficient evidence to support a conviction for attempted aggravated assault when the defendant repeatedly hit the victim in the stomach and head over a twenty-minute period).

*Victim's Prior Convictions*

Second, the Defendant argues that the trial court erred when it held that the Defendant could not use Ms. Brown's prior convictions to impeach her testimony.  The Defendant contends that the prior convictions were important evidence of the victim's credibility.  The State argues that the trial court did not abuse its discretion because the convictions were over ten years old and did not involve crimes of dishonesty.

Prior to trial, the Defendant filed a "Notice of Intent to Impeach Alleged Victim with Evidence of Prior Criminal Convictions," listing the following convictions from Wayne County, North Carolina and their sentences: a 1997 conviction for Possession of Cocaine (six to eight-month sentence); a 1998 conviction for common law robbery (nine to eleven-month sentence); and a 2000 conviction for Possession with Intent to Sell/Distribute Marijuana (five to six-month sentence).  Immediately prior to cross-examining Ms. Brown, the Defendant argued that Ms. Brown's prior convictions went to her credibility and that their probative value outweighed their prejudicial effect.  The State noted that all three convictions were listed as felonies in North Carolina but all the sentences were less than one year.  Moreover, the State noted that possession of cocaine was classified as a misdemeanor in Tennessee.  Despite the unclear felony classification, the State argued that the evidence be excluded because all of the convictions were more than ten years old and that they were not for crimes of dishonesty.  As such, the State contended that "the prejudice would outweigh any probative value for these convictions[.]"

The trial court acknowledged that possession of cocaine could be classified as a misdemeanor in Tennessee, depending on the amount of the drug found on the accused, and that the North Carolina judgment did not indicate how much cocaine the victim possessed.  Accordingly, the trial court found that the victim's conviction for possession of cocaine would be a misdemeanor in Tennessee.  Also, the trial court found that all three convictions were more than ten years old.  As to whether the probative value of the convictions outweighed the prejudicial effect, the trial court found "these drug convictions" did "not necessarily go toward dishonesty or false statement[.]"[3]  Therefore,

---

[3] The trial court classified all three convictions as "drug convictions."  It did not address the common law robbery conviction separately.

- 7 -

the trial court held that the convictions' probative value did not substantially outweigh the prejudicial effect and, as such, they could not be used to impeach the victim.

Subject to certain conditions, evidence of a witness's prior convictions may be used to impeach that witness's testimony. Tenn. R. Evid. 609(a). However, the prior conviction "must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). To determine whether a prior conviction involves dishonesty or false statement, the court must look to the elements of the crime and "not the general circumstances or environment within which the offense was committed." State v. Walker, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999).

Additionally, evidence of a prior conviction is not admissible if more than ten years have elapsed since the date the witness was released from confinement, or if the witness was not confined, the date of conviction. Tenn. R. Evid. 609(b). However, convictions that exceed this time limit may be admitted if the proponent gives the adverse party sufficient notice and the trial court "determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 609(b). Two criteria are "especially relevant" when determining whether the probative value outweighs the prejudicial effect: (a) the trial court should "analyze the relevance the impeaching conviction had to the issue of credibility" and explain the relevance on the record and (b) it must "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). We review a trial court's decision under Rule 609 for an abuse of discretion. State v. Dooley, 29 S.W.3d 542, 554 (Tenn. Crim. App. 2000).

In this case, we must first determine whether Ms. Brown's convictions would constitute felonies as defined in Rule 609(a)(2). The State acknowledges in its brief that all three convictions are classified as felonies in North Carolina. See N.C. Gen. Stat. § 14-87.1 (common law robbery is a Class G felony); N.C. Gen. Stat. § 90-95(b) (possession with intent to sell classified as a Class C, G, H, or I felony); N.C. Gen. State. § 90-95(d) (possession of a controlled substance is either a Class I felony or Class 1 misdemeanor depending on the amount possessed). The judgment sheets attached to the Defendant's motion indicate that Ms. Brown was classified as "II" for her "prior record level" and was convicted of a Class G felony for common law robbery and Class I felonies for both possession of cocaine and possession with intent to sell marijuana. Ms. Brown was sentenced to less than one year for each of her prior convictions.

Tennessee Rule of Evidence 609 defines felony as a crime "punishable by death or imprisonment in excess of one year under the law under which the witness was

convicted[.]" Tenn. R. Evid. 609(a)(2). Neither of Ms. Brown's drug convictions (both Class I felonies) were punishable by a term of imprisonment of more than one year. See N.C. Gen. Stat. § 15A-1340.17(c) (stating the maximum sentence for a Class I felony for a person classified with a II prior record level is eight months). As such, they are not felonies as defined by Tennessee Rule of Evidence 609(a)(2). Further, neither of Ms. Brown's prior drug convictions constitute crimes of dishonesty. The statutory elements of those convictions do not involve fraud or deceit. See N.C. Gen. Stat. § 90-95(a)(1) ("it is unlawful for any person . . . [t]o manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance"); N.C. Gen. Stat. § 90-95(a)(3) ("it is unlawful for any person . . . [t]o possess a controlled substance"). As such, they are not crimes of dishonesty. See State v. Waller, 118 S.W.3d 368, 372 (Tenn. 2003) (examining the elements of prior convictions to determine if they involve "deceit or fraud"). Therefore, Ms. Brown's prior convictions for possession of cocaine and possession with intent to distribute or sell marijuana were not admissible under Tennessee Rule of Evidence 609(a)(2). The trial court did not abuse its discretion when it held that the Defendant could not use these convictions to impeach Ms. Brown's testimony.

Conversely, Ms. Brown's conviction for common law robbery did satisfy the requirements of Tennessee Rule of Evidence 609(a). That conviction (a Class G felony) was punishable by a sentence which exceeded one year. See N.C. Gen. Stat. § 15A-1340.17(c) (stating the maximum sentence for a Class G felony for a person classified with a II prior record level is eighteen months). Accordingly, Ms. Brown's conviction for common law robbery constituted a felony as defined in Tennessee Rule of Evidence 609(a)(2). Furthermore, this court has previously held that robbery is a crime of dishonesty and, as such, is probative of credibility. See, e.g., State v. Nico Farmer, No. W2013-02736-CCA-R3-CD, 2015 WL 314704, at *6 (Tenn. Crim. App. Jan. 23, 2015). Therefore, Ms. Brown's prior conviction for common law robbery satisfied the requirements of Tennessee Rule of Evidence 609(a)(2).

However, Ms. Brown was convicted of common law robbery in 1998. While there is no indication of when she was released from confinement, her sentence was only nine to eleven months, and the State has not presented any evidence that she was released from confinement less than ten years before this trial. Accordingly, the record shows that the conviction is stale because more than ten years have elapsed since Ms. Brown's conviction and release. See Tenn. R. Evid. 609(b). We acknowledge that a prior conviction for robbery is probative of a witness's credibility. See Nico Farmer, 2015 WL 314704, at *6. However, there are no "specific facts and circumstances" in the record to support a finding that the conviction's probative value would substantially outweigh its prejudicial effect. Therefore, the trial court did not abuse its discretion when it held that the Defendant could not use Ms. Brown's prior convictions to impeach her testimony.

### III. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE