# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2016

## STATE OF TENNESSEE v. DONTAVIOUS HENDRIX

### Appeal from the Circuit Court for Madison County
### No. 1595     Donald H. Allen, Judge

### No. W2015-01671-CCA-R3-CD  -  Filed July 15, 2016

A Madison County jury convicted the Defendant-Appellant, Dontavious Hendrix, of one count of second degree murder. See T.C.A. § 39-13-210(a)(1). The trial court imposed a twenty-five-year sentence of confinement at the Tennessee Department of Correction to be served at 100% release eligibility. On appeal, he argues that the evidence is insufficient to sustain his conviction for second degree murder and that his sentence is excessive. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Joseph Tipton Howell, Jackson, Tennessee, for the Defendant-Appellant, Dontavious Hendrix.

Herbert H. Slatery III, Attorney General and Reporter; Zachary Thomas Hinkle, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; Aaron J. Chaplin and Brian M. Gilliam, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

Brenda Sheffield, the victim's aunt, testified that the victim, Justin Williams, arrived at her house in Jackson, Tennessee, at approximately 1:00 p.m. on July 27, 2014. He was sitting on her front porch when a red Nissan Altima pulled into a neighbor's driveway, and the victim walked over to meet the two men that got out. Sheffield identified one of the men as the Defendant-Appellant. The three men stood talking for a few minutes. The conversation did not appear to be confrontational, and no one was yelling. She then went back inside and, a short time later, heard three gunshots. She ran

to the door and watched as the Defendant-Appellant, holding a gun, and another man, whom she identified as Monderrius Miller, ran back to the Altima. The victim collapsed on the front porch. Sheffield chased the Altima in her car as it fled the scene until she saw the police. She testified that she never saw the victim with a gun and did not know the victim to carry a gun.

On cross-examination, Sheffield confirmed that she never saw the victim with a gun and did not hear anyone mention that he had a gun on July 27, 2014, but stated that she had heard later "through the streets" that the victim might have had a gun. She also confirmed that she did not observe any confrontation between the three men and that "[the Defendant-Appellant and Miller] jumped out of the car like they was cool." She admitted that she might have seen the Defendant-Appellant and Miller before but insisted that she did not know them personally. She estimated that it was approximately three minutes from when she first saw the Altima to when she heard the shots. She was unable to describe the color or shape of the gun that the Defendant-Appellant was holding. On re-direct examination she clarified that no one at the crime scene told her that the victim had a gun, but that she had heard the rumor later.

Keyandra Cole, Brenda Sheffield's daughter and the victim's cousin, testified that she was at home when the victim arrived at their house on July 27, 2014. A short time after the victim arrived, a red Nissan Altima pulled up and the victim walked over and began talking to the driver. Cole testified that she could not hear what the men were saying but described the conversation as "serious". She then went to change clothes and, as she made her way downstairs, heard three gunshots. She ran outside and saw the victim collapsed on the front porch with an apparent gunshot wound and two men, whom she identified as the Defendant-Appellant and Monderrius Miller, getting into the red Altima. She testified that she never saw the victim with a gun, did not see a gun on the scene, and did not hear anyone on the scene saying that the victim had a gun. On cross-examination, Cole stated that she and the victim had a close relationship and that he was "like [her] big brother." She also clarified that another individual, Jeremy Echols, known to her as "Gutter," arrived at the house and spoke to the victim, but left before the Altima pulled up. She never saw the victim raise his arms or use an angry tone that day but believed his conversation with the driver of the red Altima was serious, "Because when my cousin talked to someone, it was always serious."

Alexandria Holmes, who was in a relationship with the Defendant-Appellant at the time of the offense, testified that she allowed him to use her car, a red Nissan Altima, on July 27, 2014. She recalled that he dropped her off at work on July 26, 2014, and that Monderrius Miller and his girlfriend returned the car to her at approximately 2:00 p.m. the following day. She did not think it was strange that Miller returned the car to her and she testified that he and the Defendant-Appellant drove her car "all the time."

Officer Ted Maxwell of the Jackson Police Department was the first officer on the scene and estimated that there were between five and seven people present when he arrived. He recalled that the victim was suffering from an apparent gunshot wound when he arrived and was being comforted by a man on the front porch of the house. On cross-examination, he testified that he was dispatched to the scene between 1:25 and 1:30 p.m. and arrived within two minutes. He affirmed that he did not locate any weapons at the scene. Officer Rochelle Staten arrived shortly after Officer Maxwell and observed that the victim had a gunshot wound to the stomach. Officer Staten located three shell casings in the driveway near the victim, which she collected as evidence, but did not find a gun. She also took several photographs depicting the location of the shell casings and the witnesses on the scene when she arrived. Sergeant Steven Story testified that the victim had been loaded into an ambulance by the time he arrived and that he travelled to the hospital and photographed the victim's wounds. The photographs, which were introduced into evidence at trial, showed gunshot wounds to the victim's right and left thigh along with corresponding exit wounds, as well as a gunshot wound in the victim's abdomen. On cross-examination, Sgt. Story testified that he also collected the victim's personal effects from the hospital and that among those items were three broken pills which he believed to be Xanax.

Dr. Erin Carney, an expert in the field of forensic pathology, testified that she performed the autopsy on the victim. She stated that the victim suffered from three gunshot wounds, one to each thigh and one to the abdomen, and she was able to recover the bullet that struck the victim in the abdomen. Dr. Carney opined that the cause of death was multiple gunshot wounds and the manner of death was homicide. On cross-examination, Dr. Carney affirmed that there were no gunshot wounds to the upper torso or head of the victim and noted that the victim had Xanax and "a couple metabolites of marijuana" in his system when he died.

Dr. Eric Warren, a special forensic scientist with the Tennessee Bureau of Investigation (TBI) and an expert in the field of ballistic identification and analysis, examined the bullet recovered from the victim's abdomen and the three shell casings recovered from the scene. According to his examination, all three casings were fired from a nine-millimeter Smith and Wesson handgun. Dr. Warren explained that the bullet was also a nine-millimeter, but he was unable to match it to any of the shell casings. However, he determined that it could have been fired from one of three manufacturers, including Smith and Wesson, and that it was possible that the shell casings and bullet had all come from the same gun.

Investigator Aubrey Richardson, the lead investigator in the case, testified that he received a tip that the Defendant-Appellant and Monderrius Miller were involved in the shooting. He put together separate photo lineups for both suspects that showed their

-3-

faces along with the faces of five other individuals. Investigator Richardson showed the lineups to Brenda Sheffield on the day of the shooting, and she identified the Defendant-Appellant as the man with the gun. Investigator Richardson then obtained an arrest warrant and put out a "be on the lookout" (BOLO) for the Defendant-Appellant. In September of 2014, the Defendant-Appellant was apprehended by the United States Marshals Service in Indianapolis, Indiana, and Investigator Richardson picked him up on September 10, 2014.

Monderrius Miller testified on behalf of the defense and admitted that he was with the Defendant-Appellant on the day of the shooting. Miller had known the Defendant-Appellant and the victim for "years" and was not aware of any ill will between them. He recalled that on July 27, 2014, he and the Defendant-Appellant stopped to talk to the victim after visiting a friend in the same neighborhood. The Defendant-Appellant got out of the car to talk to the victim, but Miller remained in the passenger seat. Although he could not hear the conversation, it appeared casual. At one point, the victim went into the house and when he came back out Miller noticed a gun in his back-right pocket. Miller estimated that the two continued to talk for ten to twenty minutes. At some point in the conversation, Miller saw the victim "reaching and pulling the gun up." The Defendant-Appellant then drew his own gun and shot the victim. The Defendant-Appellant then got back in the car, and the two fled the scene. Miller was arrested the following day on September 27, 2014, and gave a statement to police after he was charged with the victim's murder. Ultimately, he was not indicted in the case.

On cross-examination, Miller explained that he did not call the police because he "didn't know what to do," and that he and the Defendant-Appellant never discussed the shooting in the car because they were both in shock. Miller also admitted that his testimony at trial varied from the account he gave to the police in his statement. Notably, his statement reflected that the victim was backing up and reaching for his gun when he was shot by the Defendant-Appellant, but he did not state that the victim ever pointed a gun at the Defendant-Appellant. He attributed these inconsistencies to still being in shock. Miller also claimed that he never reviewed his statement after he initially gave it to police but agreed that he initialed it in two places and signed it at the end.

At the August 17, 2015 sentencing hearing, the State introduced a copy of the presentence report without objection. It reflected that the Defendant-Appellant had previous misdemeanor convictions for possession of cocaine and unlawful possession of a weapon. Lowonda Williams, the victim's mother, testified that the victim's death had been hard on her family, especially for the victim's three children. She also stated that she had incurred $9,546.50 in funeral expenses. Chiquitta Williams, the victim's aunt, read from a prepared statement and echoed the sentiments of the victim's mother regarding the impact of the victim's death on their family.

Bonita Pruitt, the Defendant-Appellant's mother, asked the court for mercy and stated that the Defendant-Appellant was an excellent father to his three children. She acknowledged that he had made mistakes in his life, pointing to his previous misdemeanor convictions, but also noted that he had no prior felonies, had graduated from high school, and "was trying to get his life on track, working and trying to go back to school."

Following arguments from counsel, the trial court applied enhancement factors (1) that the Defendant-Appellant had a previous criminal history, in addition to that necessary to establish the appropriate range; (8) that the Defendant-Appellant had previously failed to comply with the conditions of a sentence involving release into the community; and (9) that the Defendant-Appellant possessed or employed a firearm during the commission of the offense. See T.C.A. § 40-35-114(1), (8)-(9). The trial court did not find any applicable mitigating factors. In addition, the court noted that the conviction for second degree murder was a non-probateable offense that carried a range of fifteen to twenty-five years and must be served at 100%. Based on these factors, the trial court imposed the maximum sentence of 25 years, reasoning as follows:

> I know it's the maximum sentence, but we've got to send a message. I don't know what else to do when you get situations where young people just think it's okay to carry guns and young people think it's okay to pull out guns and start shooting at each other. Unfortunately, we see this happening way too much in our community and so, I feel like it's appropriate to send as strong as message [as] we possibly can that we're just not going to tolerate it anymore from anyone. So he will be ordered to serve this twenty-five year sentence at 100%.

The Defendant-Appellant filed a motion for new trial on August 18, 2015, which the trial court denied after a hearing on August 31, 2015. This timely appeal follows.

## ANALYSIS

**I. Sufficiency of the Evidence.** On appeal, the Defendant-Appellant challenges the sufficiency of the evidence of his conviction for second degree murder. Specifically, he argues that the State failed to negate his claim of self-defense beyond a reasonable doubt. The Defendant-Appellant also argues that the State failed to prove that he "knowingly" killed the victim because the evidence showed that he shot the victim in the legs and abdomen, "as opposed to an area likely to strike a vital organ in his upper torso." The State responds that the evidence was sufficient to support the conviction in all respects. We agree with the State.

-5-

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

In this case, the Defendant-Appellant was convicted of second degree murder, which is defined as "[a] knowing killing of another [.]" T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the assault, the nature of the act, and from all of the circumstances of the case in evidence. Inlow, 52 S.W.3d at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The Defendant-Appellant argues that the evidence shows that he acted in self-defense when he fatally shot the victim. Self-defense is defined as follows:

[A] person who is not engaged in illegal activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2). The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3).

Viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found the Defendant-Appellant guilty of second degree murder beyond a reasonable doubt. At trial, Brenda Sheffield and Keyandra Cole both testified that the victim arrived at their house at around 1:00 p.m. on July 27, 2014, and that a short time later, two men pulled up in a red Nissan Altima. Both witnesses identified the men as the Defendant-Appellant and Monderrius Miller. A short time later, they heard three shots and ran to the door to see the Defendant-Appellant and Miller running to the red Nissan Altima. Neither witness saw the actual shooting. However, Sheffield observed the Defendant-Appellant carrying a gun after she heard the shots. Their testimony was corroborated by Officer Rochelle Staten, who recovered three shell casings from the crime scene, and Dr. Erin Carney, who performed the autopsy on the victim and concluded that he died from three gunshot wounds. Moreover, Monderrius Miller testified that he saw the Defendant-Appellant shoot the victim, although he claims it was in self-defense.

-7-

The Defendant-Appellant maintains that this evidence is insufficient to establish that he "knowingly" killed the victim. We disagree. The undisputed testimony was that the Defendant-Appellant intentionally fired three shots at the victim. This court has consistently held that the "deliberate firing of shots at a person constitutes 'knowing' conduct for the purpose of establishing second degree murder." State v. Tommy Dale Adams, No. M2013-01080-CCA-R3-CD, 2014 WL 3565987, at *20 (Tenn. Crim. App. July 21, 2014), perm. app. denied (Tenn. Dec. 17, 2014); see also State v. Montez Davis, No. E2011-02055-CCA-R3-CD, 2012 WL 6213520, at *11 (Tenn. Crim. App. Dec. 13, 2012), perm. app. denied (Tenn. Apr. 10, 2013); State v. Chancy Jones, No.W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *10 (Tenn. Crim. App. Apr. 5, 2012), perm. app denied (Tenn. Aug. 16, 2012); State v. Antonio Sellers, No. W2011-00971-CCA-R3-CD, 2012 WL 1067213, at *7 (Tenn. Crim. App. Mar. 27, 2012); State v. Rickie Reed, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *6 (Tenn. Crim. App. Oct. 31, 2002), perm. app. denied (Tenn. Mar. 17, 2003). Accordingly, there was sufficient evidence for the jury to find that the Defendant-Appellant acted knowingly when he killed the victim.

The Defendant-Appellant also argues that the evidence showed that he acted in self-defense when he shot the victim. In support, he points to the testimony of Monderrius Miller, who claimed that the Defendant-Appellant only shot the victim after the victim pulled a gun on him. Based on this testimony, the trial court instructed the jury on the law of self-defense. The jury heard the testimony of Miller, along with the other witnesses at trial and, as was its prerogative, rejected the Defendant-Appellant's self-defense claim. This court does not reweigh or reevaluate the proof presented at trial. Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). Accordingly, we conclude that a rational juror could find that the Defendant-Appellant committed second degree murder beyond a reasonable doubt, and he is not entitled to relief.

**II.** **Sentence.** The Defendant-Appellant also contends that his sentence is excessive according to the considerations delineated by Tennessee Code Annotated sections 40-35-103 and 40-35-210. Specifically, he contends that the trial court abused its discretion when it applied enhancement factor (1) based on previous juvenile and misdemeanor convictions. He also maintains that the trial court erred in applying enhancement factor (8) because it was based on the failure to comply with the conditions of an expunged juvenile probationary sentence. Finally, he argues that the trial court improperly applied enhancement factor (9) because the use of a firearm in this case "was an essential element of the offense itself." The State concedes that the trial court misapplied enhancement factor (8) but asserts that the sentence is nevertheless justified based on the record as a whole. We agree with the State.

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. Id. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld. Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

The Defendant-Appellant was convicted of second degree murder and was subject to a sentencing range of fifteen to twenty-five years which was required to be served at 100%. See id. §§ 40-35-112(a)(1), -501(i)(2)(B). Thus, the trial court's sentence of twenty-five years was within the statutory range. In determining the appropriate length of the sentence, the trial court applied three enhancement factors. Regarding factor (1), the State concedes, and we agree, that the trial court erred in considering the Defendant-Appellant's expunged juvenile convictions for enhancement purposes. We further conclude that the record does not support the trial court's application of enhancement

factor (8). However, despite these errors, the Defendant-Appellant has failed to show that the sentence as a whole is improper.

In regard to factor (1), the trial court erred in its consideration of the Defendant-Appellant's juvenile record, as prior juvenile offenses may not form the basis for the application of enhancement factor (1).[1] See State v. Adams, 45 S.W.3d 46, 58 (Tenn. Crim. App. 2000) ("The trial court's consideration of juvenile offenses under factor (1) was improper."). Nevertheless, the application of enhancement factor (1) is supported by the two misdemeanor convictions on the Defendant-Appellant's record. This court has repeatedly held that misdemeanor convictions may form the basis for the application of enhancement factor (1). See State v. Carlos Campbell, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *20 (Tenn. Crim. App. Oct. 20, 2015); see also State v. Corey Antuan Gray, No. W2015-00049-CCA-R3-CD, 2015 WL 7536105, at *9 (Tenn. Crim. App. Nov. 24, 2015) (applying enhancement factor (1) based on nonviolent misdemeanor offenses); State v. Carlos Campbell, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *20 (Tenn. Crim. App. Oct. 20, 2015) ("[T]his court has long held that misdemeanor convictions may be used to enhance a defendant's sentence under enhancement factor (1)."). Accordingly, the record supports the application factor (1).

The trial court also properly applied enhancement factor (9), that "[t]he defendant possessed or employed a firearm . . . or other deadly weapon during the commission of the offense," based on the Defendant-Appellant's use of a handgun in this case. See T.C.A. § 40-35-114(9). This court has held that the use of a firearm is not an element of second degree murder and may be properly considered for enhancement purposes. See State v. Hampton, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000); State v. Butler, 900 S.W.2d 305, 312-13 (Tenn. Crim. App. 1994). However, regarding enhancement factor (8), we agree with the Defendant-Appellant that the trial court's application of this factor was in error. In applying factor (8), the trial court mistakenly concluded that the Defendant-Appellant had previously been placed on probation. The presentence report

---

[1] We recognize that juvenile offenses may form the basis for application of enhancement factor (16). See State v. Jeffery B. Johnson, M2010-01721-CCA-R3-CD, 2012 WL 2356553, at *5 (Tenn. Crim. App. June 20, 2011) ("The criminal behavior at issue was committed while the defendant was a juvenile, and as such, could be considered only for purposes of applying enhancement factor (16)."); State v. Douglas Keith Bear, No. E2008-01498-CCA-R3-CD, 2010 WL 424260, at *21 (Tenn. Crim. App. Feb. 5, 2010), perm. app. denied (Tenn. June 16, 2010) ("A juvenile adjudication of delinquency which would constitute a felony if committed as an adult may be considered as an enhancement under factor (16) and not under factor (1), a history of criminal convictions or behavior."). However, here, factor (16) would not have applied because there was no adjudication of delinquency for the Defendant-Appellant's juvenile offenses, which were expunged after the successful completion of pretrial diversion. See Tenn. R. Juv. P. 23, Comm. Cmt. ("Under this rule, if the child completes the pretrial diversion agreement, the case is dismissed."); see also Douglas Keith Bear, 2010 WL 424260 at *20 ("Because the Defendant was not adjudicated delinquent [], the trial court incorrectly applied factor (16).").

reflects that the Defendant-Appellant was sentenced to incarceration as a result of his two previous misdemeanor convictions, and accordingly, he had not failed previously "to comply with the conditions of a sentence involving release into the community." T.C.A. § 40-35-114(8). As such, the record does not support the application of factor (8).

Despite this error, the Defendant-Appellant is not entitled to relief because enhancement of the Defendant-Appellant's was otherwise supported by the proper application of factors (1) and (9). As we previously noted, the court's misapplication of certain enhancement factors does not invalidate its within-range sentence unless the court wholly departed from the Sentencing Act. Bise, 380 S.W.3d at 706. Here, the record reflects that the trial court thoroughly considered the purposes and principles of sentencing before imposing a within-range sentence of twenty-five years. We therefore affirm the length of the sentence imposed in this case.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE